259 F.2d 97
 NEWTOWN CREEEK TOWING COMPANY and Chester A. Poling, Inc.,
as Coowners, and Russell Poling & Company, as Charterer of
THE RUSSELL 29 and as Bailees of the Cargo Laden on Board
The Russell 29, Libellants, Appellants, Towing Company,
Respondents. THE VENUS, Her Engines, Tackles, Apparel,
Furniture, etc., and Independent Towning Company, Respondents.
 No. 12460.
 United States Court of Appeals Third Circuit.
 Argued May 12, 1958.
Decided Sept. 11, 1958.
 
 Abraham E. Freedman, Philadelphia, Pa. (Edward Ash, Martin J. Vigderman, Freedman, Landy & Lorry, Philadelphia, Pa., on the brief), for appellants.
 Robert G. Kelly, Philadelphia, Pa. (Francis A. Scanlan, Kelly, Deasey & Scanlan, Philadelphia, Pa., on the brief), for appellees.
 Before KALODNER, STALEY and HASTIE, Circuit Judges.
 STALEY, Circuit Judge.
 
 
 1
 Point Lookout marks the southermost tip of Maryland on the western shore of the Chesapeake Bay and is located on the northern side of the entrance to the Potomac River. Approximately five miles south of this point, the barge Russell 29 ran aground on the Virginia shore while it was in the tow of the tug Venus on a voyage from Philadelphia to Washington, D.C. The owners and charterers of the barge brought suit in admiralty against the tug Venus for damage to the barge and loss of her cargo. The district court made findings of fact and dismissed appellants' libel, concluding that 'the grounding of the barge Russell 29 and the resulting loss were caused solely and exclusively by a sudden and unexpected storm of violent intensity which constituted a peril of the sea.'
 
 
 2
 The principal contention of the appellants is that the master of the tug failed to follow the usual course from the Chesapeake, around Point Lookout, and then up the Potomac; rather, he pursued a course due south of Point Lookout, before making his turn into the entrance of the Potomac. It is argued that under the weather conditions which then prevailed with strong northeast winds, such a course would being the tug and tow perilously close to the Virginia shore and, in fact, constituted negligence.
 
 
 3
 The appellants are, of course, required to demonstrate that the findings of fact of the district court are clearly erroneous. They attack especially those findings which describe the intensity of the storm at the various points on the respondent tug's voyage. The essential findings of fact are as follows:
 
 
 4
 '4. Prior to leaving Philadelphia on November 5, 1953 Captain Rickards received a weather report from a radio broadcast which informed him that the weather would remain clear throughout the intended voyage.
 
 
 5
 '5. At approximately 6:00 P.M., on November 5, 1953, while the tug and tow were proceeding down Chesapeake Bay, Captain Rickards called the marine operator at the Wilmington Marine Terminal, Wilmington, Delaware, to obtain the weather forecast for that night. He was advised that clear weather was predicted for the remainder of that night and also for the following day.
 
 
 6
 '6. After receiving the above weather forecast the tug and tow continued down the Chesapeake Bay. The Venus was then towing the Russell 29 astern on a hawser about 450 feet long.
 
 
 7
 '7. At about midnight on November 5, 1953, the Venus passed Point Lookout on Chesapeake Bay. As the tug and tow approached Point Lookout the weather was clear and the light on Point Lookout was visible. Captain Rickards estimated that he was approximately 3 miles east of this light as he passed by Point Lookout.
 
 
 8
 '8. Almost immediately after the Venus passed south of Point Lookout a sudden storm arose, with rain, hail and snow and a dense fog and mist which covered the entire area. At this point the tug and barge were north of the mouth of the Potomac River and were out in a completely exposed section of the Chesapeake Bay.
 
 
 9
 '9. The area immediately south of Point Lookout from Point Lookout to Quick Flashing Bell Buoy No. 4 which is located at the mouth of the channel of the Potomac River is a Naval Restricted Area. This area contains fish traps and probably submerged pilings.
 
 
 10
 '10. Captain Rickards knew of the fish traps, and probable submerged pilings and other obstructions in this area, from his charts and from having been down in said area as recently as a month prior to this particular voyage, and when the storm and dense fog suddenly broke upon him he decided to continue on a southerly course below Point Lookout, so that he could get well below this dangerous area before he made his turn to cut across to the mouth of the Portomac River which lay on his starboard side.
 
 
 11
 '11. Accordingly, Captain Rickards proceeded south on a southerly course making about 8 knots per hour for approximately 20 minutes. During this period of time he was completely blinded by the snow and fog and mist which enveloped the entire area except on one occasion when he saw a faint glimmer of light from Point Lookout. He was forced to steer by his compass and his chart for the area, United States Coast and Geodetic Survey Chart No. 557, which he kept before him in the pilot house. He had to judge his traveling distance by his speed and elapsed time. He marked with a '2' on exhibit 'L-1' (United States Coast and Geodetic Survey No. 557), his estimate of his position at the end of his southerly course. At this point he was in 41 feet of water and would not have been in any danger except for the storm.
 
 
 12
 '12. At approximately 12:30 A.M., on November 6, 1953, Captain Rickards calculated that he had reached a safe distance below the dangerous area referred to above and changed his southerly course to a course that would cut across the bay for the channel of the Potomac River. In checking his chart he noted that there was a seven degree variation in the area for a westerly course and he therefore steered two hundred and seventy-seven degrees by his compass in order to compensate for this variation. Shortly after he changed to his westerly course, the storm which had been raging increased to even more violent proportions. In addition to the rain, snow and hail and fog which reduced visibility to zero, the tug and barge were buffeted by northeast winds hitting broadside on their starboard side at the rate of 50 miles per hour and waves six to eight feet high washed over the head of the Bargeman, Joseph Garrett, who hazarded going out on the deck of the barge for a few seconds. The waves also washed into the pilot house window of the Venus which is located on the upper deck of the tug.
 
 
 13
 '13. Because of the intensity of the winds and the waves as Rickards proceeded on his westerly course looking for Quick Flashing Bell Buoy No. 4 he realized that the northeast winds were setting him further to the south, and in order to compensate for this driftage he increased his compass course and headed the tug higher to the north. He continued to proceed on this course searching for the channel of the Potomac River and without any aid to navigation being visible to him until approximately 1:20 A.M., on November 6, 1953, when the winds of greater than gale proportions and the unusually high waves blew the tug and barge aground on the shore almost directly south of Point Lookout. After the original grounding occurred the tug and barge were buffeted by the winds and the waves for several hours thereafter and were finally driven further inshore, so that when they reached their final resting place they were approximately five miles due south of Point Lookout.
 
 
 14
 '14. The grounding of the tug and barge was caused solely and exclusively by the sudden and totally unexpected storm[1] which the Venus encountered after she passed Point Lookout.
 
 
 15
 During his testimony, the master of the tug marked his position at various times on a coast guard chart, introduced in evidence by libellants. Number 1 marked his position at midnight of November 5, 1953; his tug was then approximately three miles due east of Point Lookout. From Point 1, the tug proceeded south for 20 minutes at 8 knots to a point about 4 1/2 miles from Point 1. Here the master marked the number 2 on the chart. Number 3 marked his intended destination about due west of number 2. The grounding of the tug and tow prevented his reaching the area marked 3.
 
 
 16
 The appellants here argue that the crucial error in the district court findings lies in its mistaking the weather conditions between points 1 and 2 with those conditions prevalent between points 2 and 3. It should be remembered that the usual course up the Potomac from the Chesapeake is a west-southwest course from point 1. The appellants argue further that the tug had intended to take the course to point 2 at the outset of the voyage, and was not prompted to refrain from taking the accustomed course because of the storm. We agree with appellants that the findings of fact of the district court are clearly erroneous in vital respects and that the decree dismissing the libel must be reversed inasmuch as the conduct of the tug's master constituted negligence.
 
 
 17
 In its discussion, the district court made the following statements:
 
 
 18
 'The essential charge of negligence in this case is that the Captain of the tug used poor judgment in the manner in which he rounded Point Lookout. Undoubtedly, under normal conditions he would have followed the usual path of vessels in making this turn-- the path plainly marked on the chart-- beset with certain dangers of which mariners are especially warned, these dangers consist of fish pots and sunken pilings. But, under the weather conditions prevailing on the night in question had he followed the usual course ignoring these warnings and had met with disaster he would have been charged with negligence in so doing probably justifiably charged. His objective was to reach the channel of the Potomac River and he believed that under the weather conditions prevailing he could accomplish his objective with greater safety by continuing southward until he reached the point where he would be out of the danger zone and could lay his course up the Potomac in safety. * * *'
 
 
 19
 This discussion is consistent with Finding of Fact No. 10:
 
 
 20
 '* * * when the storm and dense fog suddenly broke upon him he decided to continue on a southerly course below Point Lookout * * *.'
 
 
 21
 The finding that the tug master decided to go from point 1 to point 2 because 'the storm and dense fog suddenly broke upon him' is clearly erroneous.
 
 
 22
 The testimony of the tug captain himself indicates that the course he took between points 1 and 2 is the course he had intended to take from the start:
 
 
 23
 'Q. You had your course written down, did you? A. Yes, sir.
 
 
 24
 'Q. How many miles off Point Lookout were you when you had it abaft your beam? A. Approximately three miles.
 
 
 25
 'Q. You were headed about due south at that point? A. That is right, a southerly course. Do you want me to put anything else here?
 
 
 26
 'Q. What? A. Put 'southerly course' or anything here?
 
 
 27
 'Q. No, I think we have that.
 
 
 28
 'The Court: Are you in the channel now, at that time? Are you on your course?
 
 
 29
 'The Witness: Yes, sir.
 
 
 30
 'The Court: You are on your course there?
 
 
 31
 'The Witness: Yes, sir, on the course.'
 
 
 32
 The reason the tug captain gave for not taking the accustomed course was his fear of striking the fish stakes and nets. The line of these fish stakes and nets, however, is clearly marked by the buoys. At one point in his testimony the captain said that the wind from the northeast was some factor in his decision to keep going south, but it is plain that the northeast wind would tend to strike his stern and starboard side as he made his turn, and force him away from the fish nets and not into them.
 
 
 33
 Another fact makes it obvious that he had intended from the beginning to take the southerly course and had not decided to do so 'when the storm and dense fog suddenly broke upon him.' That fact is that no storm and fog 'suddenly broke upon him' at point 1 or immediately south of it. At point 1, the weather was clear and the light at Point Lookout was visible. The respondents' answers to interrogatories, which were made part of the record, clearly indicate that the storm was not sudden. At point 1, the captain observed that the weather was beginning to get bad. The following excerpts from the answers to interrogatories demonstrate that the disabling features of the storm did not begin until the tug Venus turned at point 2 to the west in an effort to go up the Potomac channel:
 
 
 34
 '* * * The wind, which was blowing at about eight or ten miles per hour increased to about fifteen miles per hour and it started to rain and hail.
 
 
 35
 'From twelve o'clock midnight to twelve-twenty A.M., January (November) 6, 1953, the tug and barge proceeded on a southerly course from Point Lookout and during this period of time, the master observed that in addition to the rain it started to hail and that the northeasterly wind had increased rapidly so that at twelve-twenty A.M. it was blowing at approximately twenty-five miles per hour. At twelve-twenty A.M., Point Lookout was bearing three hundred ten degrees true, approximately, a distance of approximately four and one-half miles. At twelve-twenty A.M. the tug Venus changed her southerly course to a westerly course and proceeded across the Chesapeake Bay, heading for the channel of the Potomac River.
 
 
 36
 'From twelve-twenty A.M. to one A.M. as the tug proceeded on her westerly course for the channel of the Potomac River, the master observed that the vapors on the waters started to rise approximately three to four feet, that a dense fog had set in and had covered the entire area, that the wind had increased from twenty-five miles per hour to forty miles per hour, that it had started to snow, that visibility was zero, and that the tug was in the midst of a violent storm.
 
 
 37
 'At one A.M. on November 6, 1953, in addition to the observations described above, the master observed a faint glimmer of light from Point Lookout Light which appeared forward of his beam as he proceeded on his westerly course for the channel of the Potomac River. Point Lookout was then bearing approximately three hundred forty degrees true. The master estimated that he was about two or three miles south of Point Lookout.'
 
 
 38
 From the answers to interrogatories, it is obvious that the dense fog did not set in until after the westerly turn was made at point 2, and that it was only after the turn that the wind increased from 25 to 40 miles per hour. At point 2, the visibility was obviously good enough to take a bearing on Point Lookout, approximately four and one-half miles away.
 
 
 39
 Finding of Fact No. 8 relates a sudden storm with dense fog almost immediately after the Venus passed south of Point Lookout. This finding is without basis in the record and is clearly erroneous. The weather was clear when the Venus was due east of Point Lookout. We do not find in the record any justifiable reason why the Venus did not take the customary west-southwest course to the Potomac channel, and instead adopted the unorthodox course due south from its position off Point Lookout.
 
 
 40
 The wind from the northeast was increasing in severity as the tug and its tow proceeded from point 1 to point 2. It should have been apparent to the captain of the tug that the further south he traveled before making the westerly turn, the greater the danger to him of running aground on the Virginia shore in the presence of the strong winds from the northeast buffeting the tug on the starboard side, and driving it and its tow to the south. Had the turn been made at point 1, the customary place, instead of point 2, those same northeast winds which later wreaked havoc, would have tended to drive the tug and tow away from the fish traps and nets. The tug could have thus reached the safety of a sheltered harbor.
 
 
 41
 The conduct of the master of the tug Venus in proceeding south from a position off Point Lookout, under the circumstances present in this case, constituted negligence. In view of this determination, other contentions raised by appellant need not be discussed.
 
 
 42
 The decree of the district court will be reversed and the cause remanded for proceedings consistent with this opinion.
 
 
 
 [1]
 'This storm is now known as the famous unpredicted storm of the century. It is a matter of public record that the United States Weather Bureau failed to predict this particular storm which is described in an official United States Weather Bureau publication as being comparable to the great blizzard of 1888. See 'The Storm of November 6-7, 1953', issued by the United States Department of Commerce Weather Bureau.'